# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01167-COA

**TAMALA HERRERA A/K/A TAMELA HERRERA**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/09/2022 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | AKILLIE MALONE OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/04/2024 |
| MOTION FOR REHEARING FILED: | |

## BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.

## BARNES, C.J., FOR THE COURT:

¶1.     A Yazoo County grand jury indicted Tamala Herrera for two counts of kidnapping and two counts of child endangerment of two minor children, E.C. and K.D.[1] A jury trial ensued, during which the trial court granted the defense's motion for a directed verdict on both counts of child endangerment.[2] The jury, therefore, considered the two kidnapping

---

[1] The victims' initials will be used in this opinion to protect their identity since they were minors.

[2] The child endangerment charges were brought under Mississippi Code Annotated section 97-5-39(4) (Rev. 2020), which requires that a child be exposed to drugs. Law enforcement found drug paraphernalia and what was thought to be drugs in the house.

charges only. After deliberation, the jury acquitted Herrera of kidnapping E.C. but convicted her of kidnapping K.D. The trial court sentenced Herrera to fifteen years in the custody of the Mississippi Department of Corrections (MDOC), with ten years to serve and five years suspended, and five years of supervised probation. Herrera now appeals, arguing two jury instructions were improperly granted, and the evidence was insufficient to support a conviction. Finding no error, we affirm.

## STATEMENT OF FACTS

¶2. On July 6, 2021, the Mississippi Department of Child Protection Services (CPS) was notified that three foster children from Yazoo County had been listed as "endangered and missing." The children were sixteen-year-old P.B. and sisters E.C. and K.D., who were thirteen and ten years old, respectively. The initial report listed them as "possible runaways," but Jennifer Creel, a CPS supervisor in Yazoo County, testified that if any child was under the age of twelve years old, the FBI treated the case as a kidnapping.

¶3. At the time, the three children lived at the home of foster parent Bobby Harmon in Yazoo City—P.B. had lived there for about two months, while sisters E.C. and K.D. had lived there for about four months. Harmon last saw the children around 11:00 p.m. on July 5, 2021. The girls left Harmon's house late that night and waited in a nearby alley for Preston Flowers, who worked at a fast-food restaurant with P.B. The FBI's investigation

---

Further, when Herrera was arrested, a substance thought to be methamphetamine was on her person. However, no test results confirmed what the substances actually were—the only identification of the substances was the testimony of FBI Agent Molly Blythe, based on her experience as an investigator. Thus, the trial court found insufficient evidence to support the child endangerment charges.

showed that P.B. and Flowers had exchanged over three hundred text messages and phone calls between July 4 and 6, 2021. P.B. admitted that she had encouraged E.C. and K.D. to leave Harmon's home with her by telling them that Harmon was going to starve them to death. P.B. told the two sisters that Flowers was her friend.

¶4. After Flowers picked up the girls in his car, he took them to McDonalds for food and a gas station for drinks. Then he took them to Herrera's home, where he had lived for the past three months because he was Herrera's boyfriend. E.C. described the house as "old" and "nasty." At Herrera's house, E.C. and K.D. were introduced to the other individuals living there, including Herrera, her two children, and Flowers's daughter Jasmine, among others. K.D. testified that she and her sister played hide-and-seek and video games with the other children in a room upstairs. The upstairs bathroom did not have running water; so the toilet did not flush. E.C. testified that Flowers and P.B. told the girls not to come downstairs. K.D. testified that if they had to come downstairs to use the bathroom, they were to knock before coming into the living room. They were also not allowed to go outside except for the back balcony.

¶5. On July 7, 2021, after investigators learned where Flowers lived, five FBI agents went to the house. Herrera answered the door and stated that she was the homeowner; Flowers was her boyfriend, but he was not home. Agent Blythe testified that the house was in "disarray."[3] Piles of clothing and "bugs, roaches, [and] flies" were everywhere. Decaying food was left out, and a bucket was used for a toilet. The house "smelled horrible." Agent

---

[3] At sentencing, the State described Herrera's residence as a "trap house," or a place where illegal drugs are consumed and/or sold.

Blythe testified that there were indications of drug use in the home—drug paraphernalia in the living room and bedroom, little bags of white substances, and what appeared to be marijuana in places.

¶6. Agent Blythe showed Herrera a missing-persons flyer with the three girls' pictures and asked if she had seen them. Herrera responded that she had never seen the girls before but offered to share the flyer on Facebook. While talking to Herrera, Agent Blythe noticed nearby another woman and a female child around twelve years old.[4] Agent Blythe asked the other woman if she had seen the girls on the flyer, and she said "no." When Agent Blythe asked the twelve-year-old girl if she had seen E.C. and K.D., she initially did not respond, but when asked by Blythe's partner, the girl nodded her head indicating "yes" and pointed up. However, Herrera told Agent Blythe that the child had "special needs and didn't always know what she was talking about." Agent Blythe learned the girl's name was Jasmine, and she was Flowers's daughter.

¶7. Herrera again told Agent Blythe that the missing children were not in the house but gave Blythe permission to look around. Agent Blythe proceeded to search the house for the children. A man was found in the kitchen and gave a false name to the agents but then admitted he was Flowers. Initially, Flowers denied knowing P.B., but when agents told him that they knew he worked with P.B., he admitted that he knew her but only for the last week and not outside of work. After more questioning, Flowers admitted to Agent Blythe that he

---

[4] Ultimately, several individuals were charged in this incident, including Flowers and P.B. Flowers pleaded guilty to kidnapping the two minor children and endangerment of a child.

had been talking to her on the phone and that he saw her the night before at a local motel with another girl who was a known prostitute. Flowers also told Agent Blythe that E.C. and K.D. were with him the night before but were left at the hotel. Flowers then called for P.B., who emerged from a closet in the room where Agent Blythe and Flowers were speaking. CPS and local law enforcement arrived at the scene to assist the FBI.

¶8. Flowers was placed in handcuffs, and P.B. was taken outside to talk to Agent Blythe and a juvenile detective. Initially, P.B.'s story matched Flowers's story—she left the two girls at the local motel with the prostitute. Two agents were dispatched to the hotel to try and find the girls. A few moments later, however, P.B. admitted the two girls were in the house. At the same time, Herrera also admitted to an officer that the two girls were in the house. Officers found E.C. under a large pile of clothes in the same closet where P.B. had been hiding. K.D. was found in an upstairs bedroom where she had been sleeping. K.D. came out when her sister called her name.

¶9. At trial, both K.D. and E.C. testified. At that time, K.D. was twelve years old, and E.C. was fourteen years old. K.D. testified that she did not want to leave Harmon's home and did not believe P.B.'s claim that Harmon was going to starve them to death. Instead, she left because E.C. was scared. E.C. testified that Flowers told Herrera they had come from Harmon's house. While the girls played upstairs, P.B. stayed downstairs. K.D. and E.C. shared a bed, sleeping upstairs in the same room with Herrera's two children and Flowers's daughter. E.C. testified that each morning "the teenagers" in the house cooked them breakfast. The girls would go downstairs to eat before returning upstairs.

¶10.   K.D. testified that she saw Herrera several times while at the house.  Once, Herrera offered to get the girls some "hot chips" when she went to the store.  K.D. testified that Herrera did not do anything else for the girls, such as cook.  K.D. testified that Herrera treated her with respect, while E.C. testified that Herrera acted nice but was "faking."

¶11.   E.C. testified that when the FBI agents came to the house, Herrera and Flowers told her and P.B. to hide.  P.B. and E.C. hid in the closet, and P.B. put clothes on top of E.C. to hide her.  At the time, K.D. was upstairs and had fallen asleep but awoke when she heard E.C. calling her name.

¶12.   Creel of CPS testified that Harmon had not given Herrera permission to be in possession of E.C., K.D., or P.B.  Further, during home meetings with the children, they never expressed being in any danger with Harmon.  Creel concluded the two young girls, coerced by P.B., decided to leave Harmon's residence.

## ANALYSIS

¶13.   Herrera argues that the evidence was insufficient to support a conviction for the kidnapping of K.D.  Additionally, she claims the jury instruction defining kidnapping (S-2) constructively amended the indictment.  Finally, Herrera contends the trial court erred by giving a jury instruction on accomplice liability (S-6).  We shall discuss each issue in turn.

### I.      Sufficiency of the Evidence

¶14.   Herrera claims the State presented insufficient evidence to support the jury's verdict on Count II, the kidnapping of K.D.  She claims the State combined sections of the kidnapping statute in the indictment and failed to prove all the elements charged in the

6

indictment. We disagree.

¶15. In reviewing the sufficiency of the evidence supporting a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Warren v. State*, 187 So. 3d 616, 627 (¶30) (Miss. 2016). The reviewing court gives the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence," and we "must accept as true all credible evidence consistent with guilt." *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015) (quoting *Ginn v. State*, 860 So. 2d 675, 685 (¶31) (Miss. 2003)).

¶16. Herrera was charged under Mississippi Code Annotated section 97-3-53 (Rev. 2020), which provides that a person is guilty of kidnapping if she or he,

> *without lawful authority and with or without intent to secretly confine*, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, *or without lawful authority shall forcibly seize, inveigle or kidnap* any vulnerable person as defined in Section 43-47-5 *or any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child. . . .*

(Emphasis added). The State had to prove that Herrera:

(A) acting without lawful authority, and

(B) with or without intent to secretly confine,

(1) forcibly seized and confined another person; or

(2) inveigled[5] or kidnapped another person with intent to confine or

---

5 To "inveigle" means "[t]o lure or entice through deceit or insincerity; to persuade (someone) dishonestly." *Inveigle*, Black's Law Dictionary 987 (11th ed. 2019).

7

imprison her against her will; or

(3) forcibly seized, inveigled or kidnapped a child under the age of sixteen years against the will of her parents, guardians, or lawful custodians.

*Young v. State*, 271 So. 3d 650, 658 (¶31) (Miss. Ct. App. 2018) (citing Miss. Code Ann. § 97-3-53). The statute thus provides that a person can be found guilty of kidnapping in three ways. *Id.* Here, since K.D. was under sixteen years old, the third (or last) method is applicable—the State had to prove that Herrera "forcibly seized, inveigled or kidnapped" K.D. against the will of her legal guardian, Harmon.

¶17. Herrera argues, however, that the State did not prove the elements found in the indictment, which differ from the statute; therefore, Herrera contends her conviction must be reversed. Count II of the indictment provided that Herrera,

on or about July 5-7, 2021 in the County and State aforesaid, did willfully, unlawfully and feloniously without lawful authority kidnap, confine, a minor, K.D. (age 10) with intent to cause her to be confined or imprisoned against her will by holding her without the permission or consent of her legal guardian at 403 Grand Avenue Yazoo, Mississippi, in violation of MCA § 97-3-53; against the peace and dignity of the State of Mississippi.

Herrera claims that the indictment "combined elements from all three" of these methods to prove kidnapping in the statute. Thus, she contends that the State had to prove that she (1) kidnapped K.D., (2) confined K.D., (3) with intent to cause K.D. to be confined against her will, and (4) without permission from K.D.'s legal guardian. Herrera also argues that the "evidence failed to establish beyond a reasonable doubt that Herrera either kidnapped or confined K.D. through inveigling, i.e. trickery or deceit."

¶18. Under her interpretation of the elements of kidnapping in the indictment, Herrera

8

claims the evidence shows K.D. was not kidnapped; instead, K.D. and her sister ran away after P.B. told her their foster mother was going to kill them. Second, Herrera argues that K.D. was not confined against her will at Herrera's home; the living room was the only part of the house off-limits. Further, the children willingly went to her home and were free to leave at any time. Finally, Herrera claims that she did not have the requisite intent to confine K.D. against her will, as Herrera was not present when Flowers picked up K.D. in the alley; there was no proof that Herrera knew Flowers was planning on taking the girls or was involved with the plan.

¶19.    While the indictment did not track the statute precisely, Herrera's interpretation of the elements of kidnapping found in the indictment is inaccurate.[6]  First, under the indictment, the State had to prove that K.D. was "kidnapped." While the term "kidnap" is an element of kidnapping, it is not defined in the statute or indictment, as Herrera notes, but is a stand-alone term. Next, the indictment uses the term "confine," explaining that "intent to confine" the child "against her will" is met by holding the child at Herrera's home without the permission or consent of K.D.'s legal guardian. We disagree with Herrera's claim that the State had to separately prove that K.D. was confined and that Herrera had to have the intent to confine K.D. against K.D.'s will, in addition to proving it was without the consent of K.D.'s guardian.

¶20.    The statute did not require the State to prove confinement for a child under the age of sixteen years old. Instead, the State only had to prove that the child was held against the

_____

[6] Herrera does not argue that her indictment is defective.

9

will of the "parents, guardians, or legal custodian." *Young*, 271 So. 3d at 657 (¶31). Here, K.D. was at Herrera's home without the permission of her legal guardian. Further, kidnapping is not a specific-intent crime; thus, the State did not have to prove that the defendant had the specific intent to kidnap. *Moberg v. State*, 303 So. 3d 815, 821 (¶20) (Miss. Ct. App. 2020) (quoting *Myers v. State*, 770 So. 2d 542, 547 (¶22) (Miss. Ct. App. 2000)). Additionally, under the statute and as stated in the indictment, a child's willingness to be taken is irrelevant. Moreover, contrary to Herrera's contention, the State was not required to prove that Herrera either "kidnapped or confined K.D. through inveigling." Under the statute, inveigling is not a required element when children are kidnapped, and Herrera's indictment does not include the term. *See Potts v. State*, 955 So. 2d 913, 918 (¶21) (Miss. Ct. App. 2007) (affirming conviction for kidnapping a child even though "inveigle" language was not included in the indictment because the State proved "forcible seizure and confinement" under the facts of the case). "[T]he State is required to prove each element in the indictment beyond a reasonable doubt." *Id.* (citing *Hennington v. State*, 702 So. 2d 403, 408 (¶16) (Miss. 1997)). We find sufficient evidence for a jury to say it did.

¶21. A plain reading of Herrera's indictment shows that the offense of kidnapping occurred when Herrera kidnapped and confined K.D. at the house by not informing K.D.'s legal guardian that she was there for several days. In a similar case, this Court affirmed a conviction for kidnapping when a child under sixteen years old willingly went with the defendant (her step-father), but the defendant lied about the child's whereabouts to her mother and failed to return the child to her mother's custody, thus holding the child against

10

the mother's will. *Young*, 271 So. 3d at 658 (¶32). Even though K.D. willingly went to Herrera's home with Flowers, K.D.'s legal guardian had not given K.D. permission to leave her foster home, as shown by the fact Harmon reported K.D. missing. Herrera did not return the children to Harmon once they arrived at her house; instead, the children stayed there for approximately three days. Lastly, even if Herrera had no prior knowledge that K.D. and E.C. were in her home without the consent of their legal guardian, she gained that knowledge when officers came to her door and showed her a flyer with the missing girls' photographs. Rather than acknowledge the presence of the children, she lied and said she had never seen them. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Herrera of kidnapping K.D.

## II. Variance between Indictment and Jury Instruction S-2 on Kidnapping

¶22. Herrera argues that the trial court erred by giving the State's jury instruction on kidnapping because it constructively amended Herrera's indictment.

¶23. "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (¶58) (Miss. 1998) (citing *United States v. Miller*, 471 U.S. 130, 137-40 (1985)). The Mississippi Supreme Court has held that "[r]eversal is automatic" for constructive amendments to indictments "because the defendant may have been convicted on a ground not charged in the indictment." *Bishop v. State*, 812 So. 2d 934, 941 (¶25) (Miss. 2002) (quoting *Bell*, 725 So. 2d at 855-56 (¶61)). However,

11

"[w]hile trial judges should generally strive to craft jury instructions that track the indictment's language, an instruction is not necessarily fatally defective for failure to do so if the instruction 'accurately follows the requisite elements of the crime.'" *Faulkner v. State*, 109 So. 3d 142, 147 (¶16) (Miss. Ct. App. 2013) (quoting *Duplantis v. State*, 708 So. 2d 1327, 1344 (¶76) (Miss. 1998)).

¶24.    The first paragraph of jury instruction S-2 cited the statutory definition of kidnapping verbatim. The second paragraph instructed the jury on the facts of Count II:

> The Court further instructs you that if you believe from the evidence in this case, beyond a reasonable doubt, that:
> . . . .
>
> (3) on or about July 5 - 7, 2021 in Yazoo County;
>
> (4) Tamala Herrera did willfully, unlawfully, and feloniously without lawful authority kidnap, confine or inveigle K.D. (10 years old) with intent to cause her to be confined or imprisoned against the will of the parents or guardian or person having the lawful custody of K.D.
>
> If the [S]tate did not prove any one of the above listed elements beyond a reasonable doubt, then you shall find Tamala Herrera not guilty of Count II.

At trial, defense counsel objected to the jury instruction's inclusion of the words "inveigle" and "confining" because there was no evidence to support these theories of kidnapping. On appeal, Herrera argues that the indictment was constructively amended because (1) the State omitted an element contained in the indictment—that K.D. was held against her will and (2) "added an inveigling theory of kidnapping" not alleged in the indictment, thereby broadening the grounds for conviction. Therefore, Herrera contends that the instruction allowed the jury to find Herrera guilty of kidnapping by inveigling—or coaxing—K.D.,

without finding K.D. was held against her will, when neither of these elements are alleged in the indictment. We are not convinced.

¶25. At trial, Herrera did not object to the jury instruction as constructively amending the indictment; she objected because there was no evidence of inveigling. Accordingly, the argument is procedurally barred on appeal. A "defendant's failure to object to a jury instruction as constructively amending the indictment . . . waives error" from appellate review. *Faulkner*, 109 So. 3d at 146 (¶14) (citing *Rubenstein v. State*, 941 So. 2d 735, 774 (¶169) (Miss. 2006)). The supreme court has "repeatedly pointed out that objections to instructions in the trial court must be specific so the trial judge has the opportunity to rule on the particular grounds relied on." *Collins v. State*, 368 So. 2d 212, 213 (Miss. 1979). Procedural bar notwithstanding, we find Herrera's argument without merit.

¶26. First, regarding Herrera's argument that jury instruction S-2 omitted the element found in the indictment that K.D. was confined against her will (thus allowing the State to obtain a conviction by proving less than what the indictment charged), as discussed in the first issue, we do not read the indictment as containing a separate element for confinement against K.D.'s will. Count II of the indictment alleged that Herrera did "without lawful authority kidnap, confine, a minor, K.D. (age ten) with intent to cause her to be confined or imprisoned against her will *by holding her without the permission or consent of her legal guardian. . . .*" (Emphasis added). Both the indictment and jury instruction provide that because K.D. was under sixteen years old, any confinement against her will was proved by the fact that she was held without the permission or consent of her legal guardian.

Therefore, the jury instruction does not broaden the elements found in the indictment.

¶27.    Second, while the term "inveigle" is not mentioned in the indictment, in the jury instruction, which tracks the statute, it is one choice of three methods available to the State to prove kidnapping of a child—kidnap, confine, *or inveigle*.  The jury did not have to find all three methods occurred—only one—for Herrera to be guilty of kidnapping.  Again, we conclude that inclusion of this term in the jury instruction did not broaden the elements in the indictment.[7]

¶28.    Lastly, for the sake of argument, even if we were to find a variance between the indictment and jury instruction, there is no reversible error.  "Not all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error."  *Bell*, 725 So. 2d at 855 (¶61).  "The central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction."  *Id.*  Here, the essence of the kidnapping charge remained the same.  The instruction required the jury to find beyond a reasonable doubt that Herrera kidnapped K.D., who was under the age of sixteen, against the will of her legal guardian Harmon.  The jury instruction's use of the term "inveigle," which is in the statute as one of three methods to kidnap a child, did not prejudice Herrera's defense.  This issue is without merit.

### III.    Jury Instruction S-6

---

[7]    Herrera acknowledges that *Young* addressed a similar issue where the term inveigling was included in a jury instruction and not the indictment.  *Young*, 271 So. 3d at 656 (¶22).  Unlike here, however, the defendant failed to object at trial.  *Id.* at 657 (¶25).  We analyzed the issue under the plain-error doctrine and found no reversible error because the variance did not substantially alter the elements of kidnapping.  *Id.* at (¶¶25, 28).

¶29. Herrera claims that the trial court erred by giving the State's jury instruction on accomplice liability. Appellate review of jury instructions is well established:

> Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion. The instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found.

*Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012) (citations omitted). However, the trial court may refuse an instruction if it "incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Johnson v. State*, 956 So. 2d 358, 362 (¶7) (Miss. Ct. App. 2007) (quoting *Ladnier v. State*, 878 So. 2d 926, 931 (¶20) (Miss. 2004)).

¶30. Jury instruction S-6 provided:

> The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognized that ordinarily, anything a person can do for herself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.
>
> If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other person just as though the defendant had committed the acts or engaged in such conduct.
>
> Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.
>
> Of course, mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that a defendant

15

either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

The trial court gave the State's instruction over objection from the defense, whose arguments included the one raised on appeal—the evidence presented at trial did not support the accomplice instruction. Herrera claims that because she was accused of secretly confining the children herself, an accomplice instruction did not apply. Specifically, she argues that the State's evidence made no connection between her and the kidnapping—Herrera was not linked to P.B., who lured the children away from home; and there was no evidence Herrera knew Flowers planned to kidnap the children or associated herself with the crime. Herrera claims the only involvement she had with the children was "caring" for them after they were brought to her home.

¶31. We find there was an evidentiary foundation for the instruction. "Any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Jones v. State*, 238 So. 3d 1235, 1241 (¶17) (Miss. Ct. App. 2016) (quoting *Hooker v. State*, 716 So. 2d 1104, 1110 (¶19) (Miss. 1998)). The evidence showed Herrera aided Flowers in the kidnapping. Even though Herrera was not present when Flowers initially picked up the girls in the alley, Herrera knew of their presence in her home

16

for several days. Herrera did not report that information to K.D.'s foster parent or law enforcement. Instead, she concealed the children's presence in her home by restricting their movement to upstairs and the back balcony. When FBI agents arrived at Herrera's house, she initially lied and denied knowledge of their presence. Her "care" of the children constituted buying them some chips at a store. The trial court did not abuse its discretion in giving jury instruction S-6.

## CONCLUSION

¶32.    The State presented sufficient evidence to convict Herrera of kidnapping K.D. Jury instruction S-2 did not constructively amend Herrera's indictment. Finally, the trial court did not err by giving jury instruction S-6 on accomplice liability. Accordingly, we affirm Herrera's convictions and sentences.

¶33.    **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

17